FILED

AUG 3 0 2017

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| ROLANDO LUGO | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No. 7:17-CV-171 |
| | § | |
| QEP RESOURCES, INC., | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

ROLANDO LUGO, Plaintiff herein, files this his Original Complaint, complaining of QEP RESOURCES INC., Defendant herein, and in support thereof would show the Court as follows:

### I. JURISDICTION AND VENUE

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended (42 USC §§ 2000e et seq.) Employment Discrimination on the basis of race (Mexican); national origin (Mexican-American); retaliation, harassment and subjection to hostile work environment in violation of the Age in Employment Discrimination Act of 1967 ("ADEA); and disability in violation of the Americans with Disabilities Act of 1990.

2. Jurisdiction in this Court is proper under 28 U.S.C. § 1331.

3. Venue in this Court is proper under 28 U.S.C. § 1391 (b) and (c) because the Defendant is a business that is subject to personal jurisdiction in this judicial district and because this judicial district is where a substantial part of the events or omissions giving rise to the asserted claims occurred.

1

## II. PARTIES

4.    Plaintiff is a fifty-three year old Mexican-American male who at the time the discrimination occurred was employed by Defendant in Tarzan, Texas as a Health Safety and Environment (HSE) Field Specialist.

5.   Defendant is an independent crude oil and natural gas exploration and production company incorporated in the State of Colorado conducting business in Tarzan, Martin County Texas and operating its mail business within this judicial district.

## III. CONDITIONS PRECEDENT TO SUIT

6.   In Octobert.2014 Plaintiff was flown to Denver, Colorado by Defendant for a one-on-one interview with Supervisor John Jehn; and also had a phone interview with Mike Miller (John Jehn's Supervisor); and his final interview was conducted by and with Lindsey Greer, Human Resources (HR) Manager.

7.   Plaintiff disclosed to Defendant's Resources Management Team: John Jehn, Mike Miller, and Lindsey Greer he was not relocating to Midland, Texas, but instead would rent an apartment or buy a mobile home to be moved to Midland, Texas because he did not want to sell his home or move his family because of the instability "of working in the oilfield".

8.   Defendant did not challenge or rebutted Plaintiff's position of not totally relocating to Midland, Texas.

9.   Defendant offered Plaintiff the position of HSE Field Representative.

10.   Prior to accepting the position of HSE Field Representative Plaintiff disclosed to Defendant (Lindsey Greer) two concerns: (a) he was afraid he may lose the job because of an oil depression; and (b) being that the position would be in West Texas was concerned of the possibility of race discrimination because of his of Hispanic origin.

11.  Plaintiff disclosed to Defendant he had experienced discrimination in his prior jobs; and that when he reported the discrimination to upper management, he was subjected to retaliation by management which created a very hostile work environment for him.

12.  Defendant assured Plaintiff (a) QEP Resources would never lay off an employee, that QEP would move the employee to another area or job classification before terminating any employee from their said position; and that (b) QEP Resources does not tolerate discriminatory behavior within the company and explained, that reports of such behavior would be taken seriously and any personnel found in violation of QEP discrimination policy would be terminated from his or her position of employment.

13.  Plaintiff accepted the position of HSE Field Representative that included an annual salary of one hundred and ten ($110,000) dollars, plus a fifteen (15%) percent increase associated to geographical location, making his annual salary a total of one hundred and twenty-six thousand five ($126,500.00) dollars; and included a minimum fifteen (15%) percent annual bonus; ten thousand ($10,000) Restricted Company Stock Shares; medical, dental, vision, and life insurance, Short and Long Term Disability 401k with Defendant matching eight (8%).   Plaintiff begin employment with Defendant on or about November 4, 2014.

14.   On or about December 10, 2014, Plaintiff was diagnosed with "severe acute diverticulitis" by Dr. Phillip Gafford, Midland Surgical Associates, 2405 West Missouri Ave. Midland, Tx. 79701, (432-697-106); and was hospitalized at the Midland Memorial Hospital, 400 Rosalind Redfern Grover Parkway, Midland, Tx. 79701 from December 10, 2014 to December 20, 2014.

15.  Plaintiff was unable to return to work from December 10, 2014 to January 5, 2015 and was on "short term disability" (STD).

16. Plaintiff returned back to work on or about January 10, 2015 but on or about February 3, 2015 Plaintiff suffered a relapse of his diverticulitis and was admitted back into Midland Memorial Hospital on February 10, 2015.

17. On or about March 11, 2015 Plaintiff had surgery at Christus Santa Rosa Hospital (2827 Babcock Rd, San Antonio, TX. 78229) and had thirteen (13) inches of his colon removed.

18. Plaintiff was out of work and on STD leave from February 10, 2015 to April 15, 2015. During this period of time Plaintiff would make weekly calls to his Supervisor John Jehn and Mark Spannaus, QEP Environmental Field Specialist to update them on his condition.  Plaintiff was assured his employment was not at risk.

19. Plaintiff returned back to work on or about April 15, 2015 fully capable of performing the duties and responsibilities of my position as HSE Field Representative.

20. On three occasions occurring between July and August 2015, Eric Barbee, QEP Production Operator, Anglo male, had displayed animus towards Mexican-American employees Paulette Dela Rosa, (contract employee); Armando Rocha, QEP Construction Foreman; Roy Lopez, Contract Welder; and Plaintiff when they gather in Armando Rocha's, (Mexican-American) Construction Forman of QEP Resources, office and spoke Spanish.

21. Eric Barbee angrily would tell Plaintiff and Mexican-American employees that "We need to be speaking English around here" and then would go into the Pumper's Room/Office slamming the door shut.

22. Paulette Dela Rosa, Roy Lopez, and Armando Rocha disclosed and informed Plaintiff Barbee's conduct was discriminatory, comments were racial, and was a pattern Barbee had engaged on other occasions.

23.  Plaintiff disclosed to Paulette Dela Rosa, Roy Lopez, and Armando Rocha he "would not put up with this type of behavior towards Hispanics" and in July 2015 reported Barbee's conduct and disclosed existing harassment and racial remarks to Billy Barrick, Production Foreman.

24.  Plaintiff disclosed to Barrick of Armando Rocha's, Paulette De la Rosa's, and Roy Lopez' disclosure of Barbee's discriminatory conduct to other Hispanic co-workers.

25.  Plaintiff informed Barrick this was not the first time Barbee had acted in this manner towards the Hispanic co-workers; should not be tolerated; and needed to stop; and that if Barbee's "behavior did not come to a stop" he [Plaintiff] "would go higher up the chain of command John Jehn, QEP HSE Supervisor, and or Mike Miller, QEP HSE Manager to report these incidents.

26.  Plaintiff is unsure whether Billy Barrick spoke to Barbee about his conduct.

27.  After disclosing Barbee's discriminatory conduct, Plaintiff was subjected to isolation by male Anglo employees: Billy Barrick; James Bobby Compton's, Production Foreman; and Eric Barbee.

28.  Plaintiff was denied information regarding Defendant's certain locations, where work was being performed; was no longer welcomed inside their offices; not being invited to office group lunches; and would no longer greet each other in the morning and would no longer shake hands. Eric Barbee also subjected Plaintiff to hostility in the field by not being in HSE compliance under QEP Policies.

29.  Plaintiff's responsibilities as a HSE Field Representative required him to perform included: Bend, stoop, lift up to 100lbs, assist contractor's in the field when no help was around, climb stairs on drilling rigs, conduct HSE Field Inspections around Drilling Rigs, Production sites,

FRAC Sites, Pulling Unit sites, sit, stand, and walk around locations for up to 12 hours daily. Drive on very rough roads and terrain for up to 8 hours daily, conduct daily contractor meetings.

30.  On or about August of 2015, while conducting field inspections at one of Defendant's field locations, Plaintiff reported to Orlando Calixto, Workover Rig Supervisor at University QEP Fields, Andrews, Texas his back "was killing me [Plaintiff] after driving down the bumpy lease roads".

31.  Plaintiff's back pain worsen after conducting a field inspection of the Topp's Pulling Unit equipment  around August, 2015 and informed Orlando Calixto he [Plaintiff] was going to have to go to the doctor.

32.  Plaintiff was experiencing real sharp pain in his mid-back radiating to his left groin area and informed Orlando Calixto he believed it was associated to his prior illness of the diverticulitis. When CAT scan and blood results came back they were negative of severe acute diverticulitis and positive on a collapsed L2-L3 disc.

33.  On or about September 4, 2015, after an examination and MRI scan of Plaintiff's back Dr. Alexandar Roka and Dr. Moises Soulas (surgeon that performed Plaintiff's second surgery for his diverticulitis on March 9, 2015) determined Plaintiff's back injury/pain was not associated to my history of Diverticulitis.

34.  In October 2015 Plaintiff was admitted to Christus Santa Rosa Hospital (403 Treeline Park, San Antonio, Tx. 78209) was treated for the possible relapse of my severe acute diverticulitis, with Cat-scan and lab work was ordered.  Dr. Moises Soulas informed Plaintiff his back pain was not associated with diverticulitis and the pain was from a ruptured disc that was found on the MRI scan that was performed on September 4, 2015.  Dr. Moises Soulas advised Plaintiff to seek the medical treatment from a neurosurgeon.

35. On or about September 6, 2015, Plaintiff I returned back to work. John Jehn asked Plaintiff what "was wrong with you [Plaintiff]" and explained to John Jehn to what he avised to do by Dr. Moises Soulas and would have to undergo other tests in order to find the cause of the back pain.

36. On or about September 5, 2015, Plaintiff met with Dr. Alexander Roka, Family Care Dr/Board Certified/PCP ordered an MRI of Plaintiff's lumbar spine.

37. On or about September 13, 2015, Plaintiff received a call from Dr. Roka's office regarding the results of the MRI. Plaintiff was informed the MRI showed there was a collection of fluid in Plaintiff's lumbar spine extending from the L4-S1 Levels and had a severely collapsed/ruptured disc at the L2-L3 level.

38. Jessie Silvas, QEP HSE Field Representative, present at the time Plaintiff received the call from Dr. Roka asked Plaintiff what the findings of the MRI were; to which Plaintiff disclosed the MRI findings.

39. Silvas disclosed to Plaintiff that Gareth Young, Silvas former Supervisor, had informed him [Silvas] about Plaintiff's back injury he suffered twenty-seven (27) years ago (1991) and of Plaintiff filing a Worker's Compensation claim.

40. Plaintiff asked Silvas why he [Silvas] and Young were discussing Plaintiff's personal medical information without his knowledge or permission. Silvas replied Young had disclosed to him [Silvas] he [Young) was able to look up any employee's prior injuries and Worker's Compensation claims without anyone knowing. Gareth Young also worked with Plaintiff at Nabor's Drilling back in 2008 where Gareth Young was a HSE Field Rep. and later was promoted to HSE Manager with Nabor's Drilling.

41.   Plaintiff continued to work to the end of September 2016 and on October 1, 2015 Plaintiff was on Short Term Disability related to his back injury suffered in August,2015.  Plaintiff sought medical assistance and was placed in the hospital to drain the collection of spinal fluid in his lumbar spine by Dr. Roberto Aranibar on October 6, 2015 this was his first day of loss as per QEP Resources and this was the date that STD benefits were to begin.

44.   Plaintiff's Supervisor John Jehn instructed Plaintiff to file a Personal Injury claim rather than a Worker's Compensation claim with Anthem Blue Cross/Blue Shield.  Plaintiff questioned these instructions and felt he should file his injury as a Worker's Compensation claim due because his back injury occurred while he was working in the field for QEP Resources to which Jehn assured Plaintiff that filing a Personal Injury claim rather than a Worker's Compensation claim was correct.

45.   During December 2015, and during the time of Plaintiff's surgeries, Claims Specialist Rachel Donnefield, QEP's Manager for Employee's benefits with BC/BS and STD, would contact Plaintiff and ask if Dr. Guy Fogel would recommend any type of light duty work.

46.   Rachel Donnefield, QEP Benefits Manager, Rebecca Marquez Hughes, Benefits Administrator, informed Plaintiff that Defendant would offer a transitional return to work program and would follow Dr. Fogel's work restrictions.

47.   On or about January 18, 2016, Plaintiff underwent his first back surgery.

48.   In January, 2016, Plaintiff was contacted by Defendant's newly hired Claims Specialist, Anna Marquis Hughes.  Ms. Hughes questioned Plaintiff about the return to work transitional forms to which Plaintiff informed Hughes he would talk to Dr. Fogel about the transitional return to work program with restrictions.

49.   Both Donnefield and Hughes informed Plaintiff Defendant offered this type of transitional return to work program to employees who were on STD leave; however, Hughes without Plaintiff's knowledge sent the transitional return to work program forms to Dr. Fogel on or about January 15, 2015 prior to my surgery and then a second time after my January 18, 2015 surgery.

50.   Dr. Fogel filled out the transitional return to work program forms on behalf of Plaintiff in February 2015 with the following restrictions, "No lifting more than 5lbs".

51.   Hughes contacted Plaintiff and informed him Defendant could not work with the restrictions Dr. Fogel had presented to Defendant.

52.   Plaintiff questioned Hughes' and Donnefield's assurances that the transitional work services was a benefit Defendant offered to all employees on STD and Defendant would comply with the medical restrictions.

53.   Hughes informed Plaintiff he would have to be released 100% with no restrictions to return back to work.  Dr. Fogel had informed Plaintiff he would not be able to return to work without restrictions.

54.   Plaintiff informed Huges there was an exemption to the QEP Employment/Employees Benefits which provided that as long as "my [Plaintiff] immediate supervisor, John Jehn was aware I [Plaintiff] needed an extension of STD leave the extension shall be granted to the employee".

55.   Plaintiff informed his Supervisor John Jehn on or about March 5, 2016 that he was expected to return to work on April 18, 2016 and was disclosed in Plaintiff's monthly report sent to Anna Marquis Hughes in February 2016.  Jehn conveyed to Plaintiff "not to rush things" and "my [Plaintiff's] job was safe", "not to worry about anything", and that "he and QEP [Defendant] wanted me back healthy" and "not to lie to my [Plaintiff's] doctor just to return back to work".

[Defendant] wanted me back healthy" and "not to lie to my [Plaintiff's] doctor just to return back to work".

56.   On or about April 10, 2016 Plaintiff received a phone call from his Supervisor John Jehn and Tammy Chabre Lewis, QEP HR Specialist and informed Plaintiff he was being terminated from employment because he [Plaintiff] had exhausted all of his STD leave and was being placed on Long Term Disability (LTD).

57.   Plaintiff questioned why this action was being taken against him during a period of approved medical/FMLA leave and was returning back to work on April 18, 2016.

58.   Lewis informed Plaintiff the issue of being on FLMA did not matter and Plaintiff had exhausted all of his STD leave and this was the reason he was being terminated. 55.  Lewis made it clear that the decision was already made by upper management and Plaintiff's position was being terminated no matter if QEP's Employee's Benefits policy provide for extension of STD existed.

59.   Plaintiff asked Lewis for Jeff Tommerup's, HSE Director, direct telephone line for the purposes of discussing his termination this matter but Lewis refused to provide Plaintiff Tommerup's telephone number. Ms. Lewis informed me the decision was already made and there was nothing that I could do about it.

60.   Lewis informed Plaintiff it was Defendant's policy to terminate employment when an employee had exhausted all of their STD Leave.

61.   Defendant offered Plaintiff a severance package that included only a subsidized COBRA health coverage for only three (3) months.  Hughes strongly urged Plaintiff to sign the documents but also advised Plaintiff if he agreed to the terms in the package, once Plaintiff signed the documents he would waive his rights to file and wrongful termination and discrimination claims against QEP Resources/Energy.  Hughes would continuously call Plaintiff asking if he had

signed the documents and informed him his deadline to do so was April 28, 2016. Plaintiff refused to sign the documents.

62. Defendant discriminates against Hispanics/Mexican-Americans.

63. Paulette DeLaRosa, Hispanic/Mexican American female, worked for Defendant at its field office in the Tarzan, TX. In November 2015 DelaRosa informed Plaintiff she was being laid office because her being removed or dissolved. A few weeks later DelaRosa's position was given to Cole Green's , QEP Field Engineer, wife, Anglo female who had moved to the Midland because her husband had been transferred to the Midland office due to the closing of Defendant's Oklahoma field office.

64. JoAnne Hanchey, John Jehn's assistant Anglo female; was on medical leave for cancer treatment during the same period Plaintiff was on FMLA. Hanchey was not laid off or terminated but allow to return to work. JoAnne Hanchey was on STD leave about the same time that Plaintiff was on medical leave. It is not known by Plaintiff when JoAnne Hanchey did return back to work because no person at QEP Resources would ever talk again with Plaintiff. JoAnne Hanchey was on STD leave even before Plaintiff was placed on STD leave. JoAnne Hanchey is John Jehn, secretary.

65. Defendant denied Plaintiff reasonable accommodations.

66. Defendant retaliated against Plaintiff because of his protected disclosures of race discrimination.

67. Defendant terminated Plaintiff because of his disability/medical condition.

68. Defendant wrongfully terminated Plaintiff.

70. On or about February 2017 Plaintiff received the EEOC's Notice of Right to Sue dated May 31, 2017.

## IV. CAUSES OF ACTION

A. Title VII employment discrimination

71. The conduct of Defendant constitutes a violation of the Equal Employment Opportunity Acts prohibitions of discrimination based upon Race (Mexican); National Origin (Mexican-American); gender (male); 42 U.S.C. 2000e, et seq.

72. This violation caused Plaintiff to suffer damages.

B. Retaliation

73. Defendant has participated in retaliation against Plaintiff, causing him economic and other damages.

C. Harassment and Hostile Work Environment

74. Defendant has participated in harassment and hostile work environment against Plaintiff, causing him economic and other damages.

D. Americans with Disabilities Act of 1990-Discrimination

75. Defendant has participated in wrongful employment actions against Plaintiff due to his disability causing him economic and other damages.

E. Age Discrimination in Employment Act of 1967 (ADEA)

76. Defendant has participated in wrongful employment actions against Plaintiff due to his age causing him economic and other damages.

## V. DAMAGES

## V. DAMAGES

77.  Defendant's acts and omissions have caused Plaintiff to suffer damages including past and future lost earnings (including back pay and front pay), past and future injury to reputation, and past and future mental anguish.

78.  Plaintiff seeks recovery of these damages from Defendant.

## VI. ATTORNEY FEES

79.  Defendant's acts and omissions have caused Plaintiff to incur attorney's fees and court costs.  Plaintiff is entitled to an award of attorney's fees and costs under Title VII, 42 U.S. C. § 2000e-5(K).  Plaintiff seeks recovery from Defendants of all attorney fees and court costs through judgment in this court with additional contingent amounts in the event of post judgment and appellate proceedings.  All conditions precedent to the recovery of attorney fees have been satisfied.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendant be cited to appear and answer herein to Plaintiff's Original Complaint, and that upon final trial, this court enter a judgment awarding the Plaintiff all of the aforementioned damages, attorney fees, costs of court, and prejudgment and post-judgment interest.  Plaintiff also asks for such other and further relief, whether legal or equitable, to which Plaintiff may be justly entitled.

Plaintiff requests a jury trial.

Respectfully Submitted,

ROLANDO LUGO, *pro se*
20919 Encino Dawn,
San Antonio, Texas 78259
Tele.210-396-9503.